# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Carlos Alberto Rodrigues De Freitas, individually and as administrator of Isabel Aparecida Auler's estate,

      Plaintiff

v.

The Hertz Corporation,

      Defendant

Case No.: 2:18-cv-01522-JAD-BNW

**Order Denying Defendant's Motion for Attorneys' Fees, Granting in Part Plaintiff's Motion to File a Surreply, and Denying Plaintiff's Motions for an Indicative Ruling and to Set Aside Judgment**

[ECF Nos. 269, 277, 286, 287]

This catastrophic personal-injury action arose from a terrible collision in the Hertz rental-car return area at the Las Vegas Airport. While returning his rental car, Robert Charles Stevens crashed into Brazilian tourists Carlos Alberto Rodrigues De Frietas and Isabel Aparecida Auler as the couple was unloading theirs. Auler and De Freitas sued Hertz and Stevens and, when Auler died three years after the accident, De Freitas continued pursuing her claims on her estate's behalf. Stevens settled the claims against him, so the case went to trial against Hertz on De Freitas's theory that Hertz's negligent design of the return area contributed to the crash. The jury found in Hertz's favor and Hertz now moves for attorneys' fees based on a pretrial offer of judgment. De Freitas opposes, primarily arguing that the offer was never properly served. De Freitas also moves to set aside the judgment, contending that two of Hertz's experts lied on the stand about how much they were paid to give their opinions, tainting the verdict in this expert-reliant case and defrauding the court.

I deny De Freitas's motion to set aside judgment because he grossly overstates the misconduct he alleges and has not shown that he couldn't have discovered the experts'

misrepresentations through pretrial diligence or that these errors merit the drastic remedy he seeks. I deny Hertz's attorneys' fees motion because its service of the offer of judgment by email was insufficient under Federal Rule of Civil Procedure 5, and none of Hertz's justifications saves the deficient service. I then deny Hertz's bill of costs without prejudice to its ability to file a revised one to comport with this ruling and better comply with this district's local rules.

## Background

**A.  Robert Stevens crashes into Auler and De Frietas while returning a Hertz rental car at the Las Vegas International Airport's consolidated rent-a-car center.**

On New Years Day in 2017, Brazilian citizens and domestic partners Carlos Alberto Rodrigues De Freitas and Isabel Aparecida Auler were returning their rental car to Hertz's return center at the Las Vegas International Airport.[1] Hertz's return lanes were fifteen feet wide, which permitted a seven-foot gap between cars that were parked in adjacent lanes.[2] While Auler and De Freitas were unloading their car, an elderly two-foot driver[3] Robert Charles Stevens confused the gas and brake pedals in the rental car he was returning, accelerated through the gap between the parked cars, and drove directly into Auler and De Freitas.[4]

Auler suffered severe injuries and a traumatic brain injury from the crash. She endured years of intensive medical care with De Freitas by her side, which took a heavy toll on De Freitas's mental health.[5] Three years after the accident, Auler died from an infection that De

---

[1] ECF No. 119 at ¶ 3.2.

[2] *See* ECF No. 237 at 51:10–16; ECF No. 223 at 36:8–17.

[3] Stevens drove with both feet on the pedals—one for the brake and one for the gas.

[4] *See* ECF No. 237 at 33:21–34:7.

[5] *See* ECF No. 230 at 64:20–65:6; ECF No. 240 at 38:5–45:20.

Freitas and his medical expert attributed to the crash.[6]  De Freitas sued Stevens and Hertz on negligence-based theories, alleging that Stevens was negligent for accelerating into the return area and Hertz's decision to have 15-foot lanes was negligent because it created a gap wide enough for Stevens's car to squeeze through and run down Auler.[7]  De Freitas settled the case against Stevens in 2019, so the case went to trial against Hertz alone on De Freitas's negligent-lane-width theory.[8]

**B.     Five years later, the jury finds in Hertz's favor after an eight-day trial.**

This case was tried in May and June of 2023.  It was a chaotic trial, mostly because De Frietas's out-of-state lawyer, Jonathan Charles Capp, Esq., working without co-counsel or support staff, repeatedly complained about the time constraints on his disorganized presentation of evidence, failed to timely provide the court or the defense with filings that needed resolution for the proper and efficient presentation of his case, asked primarily leading questions on direct examination, and consistently talked over opposing counsel and the court to voice his discontent with any ruling that didn't perfectly go his way.[9]  De Freitas introduced 16 witnesses in his case in chief; Hertz presented 8 witnesses of its own.  Because only the expert testimony opining on

---

[6] *See* ECF No. 226 at 70:7–19.

[7] ECF No. 119 at ¶¶ 3.5, 3.10.

[8] *See* ECF No. 82 (order granting stipulation to dismiss Stevens based on good-faith settlement).

[9] *See, e.g.*, ECF No. 223 at 62–66 (Capp changing deposition designations because he gave defense the wrong documents); ECF No. 226 at 12–15 (Capp telling Hertz that he wishes to present live testimony of a Hertz witness despite not requesting that witness be produced before trial); ECF No. 230 at 72 (noting that Capp did not provide an exhibit list that matches the exhibits in his binders), 77–79 (noting that Capp failed to file deposition designations because he was choosing what to designate on the fly); ECF No. 237 at 14 (simultaneous cross-talk between counsel); ECF No. 222 at 7, 31 (Capp talking over the court); ECF No. 223 at 6, 73 (Capp talking over the court); ECF No. 257 at 28–33 (Capp gaming his witness's availability in an attempt to have own psychologist expert—not one of the defense's witnesses—be the last witness at trial).

the wisdom of Hertz's 15-foot-wide return lanes is relevant to De Freitas's motion to set aside judgment, I recount only that testimony and attorney argument about it here.

### 1. De Freitas's experts testify about lane-width standards and whether the gap between Hertz's 15-foot lanes contributed to the accident.

The duty and causation elements of De Freitas's negligence claim relied on proving that Hertz's 15-foot lanes were so dangerous that Hertz should have foreseen that an errant driver would drive through the gap between parked cars and hit other customers.  This lane-width dispute ultimately came down to a battle of the experts.  De Freitas offered testimony from Thomas Brannon, a retired employee of the California Department of Transportation with experience in road- and traffic-safety standards.[10]  He had no specific expertise in the rental-car industry and no experience evaluating the safety of rental-car return lanes,[11] but he opined that the "standard in lane width in car rental return facilities is 9.5 to 10 feet."[12]  Brannon formed that opinion after discerning the average lane width at nine consolidated rent-a-car centers (ConRACs) and determining that all of the "busiest ConRACs in the country" had 9.5- to 10-foot lanes.[13]  Brannon also cited to Hertz's Operations and Maintenance Manual, which contained a drawing of an exemplary ConRAC that had 10-foot lanes.[14]  On cross-examination, Hertz asked

---

[10] ECF No. 222 at 100:10–11, 104:7–105:5.

[11] ECF No. 223 at 12:13–18, 14:4–21; *see also* ECF No. 284 at 127:15–128:13 (granting Hertz's motion in limine to prohibit Brannon from opining on alternate safety designs for the lanes at Hertz's return area because he "doesn't have expertise under Rule 702 to do so").

[12] ECF No. 222 at 105:9–10 (cleaned up).

[13] *Id.* at 105:13–106:7–15.

[14] *Id.* at 114:22–115:5.

Brannon how much he was paid to render expert opinions for De Frietas, and he answered that he billed approximately $32,000.[15]

De Freitas also introduced the testimony of human-factors expert Joseph Cohen, who holds a masters in applied experimental psychology and a Ph.D. in industrial and organizational psychology.[16] Cohen testified that it was "reasonable and normal driving behavior" for Stevens to aim his car toward the gap between parked cars—and thus to drive between the two 15-foot return lanes—to avoid hitting people and other cars once he realized that he was accelerating instead of braking.[17] Cohen elaborated that Stevens naturally headed toward the gap because it presented "a space . . . for him to drive."[18] On cross-examination, Hertz established that Cohen was a professional expert who advertised his "error-analysis" services primarily to lawyers engaged in personal-injury litigation.[19] Cohen also testified that he had never conducted an error analysis for any type of accident occurring at a rental-car-return facility, but that he had analyzed "many crashes . . . that have similar circumstances" and applied "the same human-factors method and principles."[20] He agreed that at least 60% of the cases he provided expert reports for were slip-and-fall cases.[21] Cohen also testified that he charged $395 per hour to serve as an expert and had billed approximately 20 hours on this case.[22]

---

[15] ECF No. 223 at 12:9–10.

[16] ECF No. 237 at 21:11–19.

[17] *Id.* at 35:3–8.

[18] *Id.* at 36:17–20.

[19] *Id.* at 54:21–55:16.

[20] *Id.* at 58:3–17.

[21] *Id.* at 59:2–5.

[22] *Id.* at 57:7–20.

Finally, engineer Gary Presswood testified about the physics of how a crashing vehicle would move if it attempted to drive through cars parked in the center of adjacent 10-foot lanes instead of the 15-foot lanes that Stevens drove through.  Presswood opined that, had Stevens attempted to drive through the smaller gap left by 10-foot lanes, Stevens's car would have "hit the corners" of the two vehicles in the adjacent lanes and the weight of those two cars would have stopped Stevens's car.[23]  After impact, his car would have moved "maybe a foot" and the vehicles he hypothetically hit would have moved about three feet.[24]  On cross-examination, Hertz elicited testimony that Presswood is a professional expert who markets directly to lawyers and is paid $750 per hour to testify in court.[25]

### 2. *Hertz's experts testify that 15-foot lanes are safer than 10-foot lanes.*

Hertz countered De Freitas's expert line-up with two of its own, both with experience in the rental-car and transportation industries.  Jerry Marcus testified that he consulted on the creation of ConRACs for four international airports and was tasked with designing their functional aspects, with an emphasis on anticipating the interactions between pedestrians and rental cars.[26]  He opined that there is a minimum standard for lane widths (9 to 10 feet) but no maximum standard.[27]  Marcus also testified that lanes wider than the minimum are safer because the extra space gives customers more room to get out of their cars and collect their belongings without spilling into other active return lanes.[28]  He also testified that Hertz's use of delineators,

---

[23] ECF No. 246 at 26:12–28:2.

[24] *Id.* at 27:1–23.

[25] *Id.* at 30:11–31:13, 34:2–4.

[26] ECF No. 247 at 15:5–21.

[27] *Id.* at 18:6–21.

[28] *Id.* at 19:4–19.

painted yellow solid lines between the lanes, and signage with clear arrows directing returning customers "exceeded the standard of care."[29]  On cross-examination, De Freitas asked Marcus how much he had been paid to serve as an expert for Hertz, and Marcus answered: "I believe I billed out in the last three and a half years $25,000.  Something like that."[30]

Hertz's second expert, Jeffrey Jarvis, testified that he had been designing rental-car facilities at airports for 25 years and was the architect of record for about 20 ConRACs throughout the United States and Canada.[31]  Jarvis also testified that the minimum lane-width standard is 9-10 feet and that there is no maximum standard.[32]  He stated that rental-car companies usually opted for the minimum standard because the space needed to build larger lanes would increase the price of the facilities but, if he had his way, he'd prefer to design them wider to alleviate crowding as customers are unloading and company employees are inspecting the returned cars.[33]  But Jarvis also testified that he couldn't point to any return area other than Hertz's Vegas location that utilized 15-foot lanes.[34]  On cross-examination, De Freitas asked how much Jarvis "was paid to assist Hertz in this case" and he answered, "I'm guessing that the invoices so far are something like $2,000."[35]  De Freitas's counsel, apparently surprised by that low estimate, asked again: "$2,000 for all the work you've done in this case?  You've authored like, at least four reports, haven't you?"[36]  Jarvis responded, "I think so.  Maybe [$2,500].  It's

---

[29] *Id.* at 21:10–18, 26:15–21.

[30] *Id.* at 60:11–12.

[31] *Id.* at 64:9–24.

[32] *Id.* at 66:13–20.

[33] *Id.* at 67:4–68:5.

[34] *Id.* at 78:17–22.

[35] *Id.* at 79:1–3.

[36] *Id.* at 79:6–7.

been a long time since I—you know, it's [been] four years or something since I submitted an invoice, so . . . ."[37]  Hertz didn't ask any follow-up questions about Jarvis's pay on re-direct examination.

### 3.  Counsel for both parties focus their closing remarks on the other sides' experts, and the jury sides with Hertz.

During closing arguments, De Freitas's counsel argued that it was "common sense" that the 7-foot gap created by Hertz's 15-foot lanes negligently contributed to Auler's injuries.[38]  He contended that Stevens's pedal confusion was "perfectly foreseeable," and so was Stevens's split-second decision to drive through that gap rather than hit the cars on either side.[39]  He also argued that Hertz's experts essentially conceded that the company's lane-width decisions were about money, not safety.[40]  He emphasized that several Hertz witnesses testified to having no safety or traffic-management protocols or training in place.[41]  And he told the jury that Jarvis's and Marcus's testimony was "irrelevant" because they didn't give opinions about the accident itself.[42]

In response, Hertz's counsel argued that this accident was caused by one thing alone: Stevens's pedal error.[43]  He emphasized Marcus's testimony opining that the various safety measures that Hertz employed at the return area—solid yellow lines and delineators between

---

[37] *Id.* at 79:10–12.

[38] ECF No. 282 at 40:3–9.

[39] *Id.* at 40:10–23.

[40] *Id.* at 50:8–51:4.

[41] *Id.* at 62:14–65:14.

[42] *Id.* at 44:19–45:4.

[43] *Id.* at 88:5–25.

lanes, unmistakably clear signage—exceeded the standard of care.[44]  He also disparaged De Freitas's experts, noting that "his experts are all advertising and making their living just working for lawyers," while Hertz's experts "work in the [rental-car] industry."[45]  He focused on De Freitas's human-factors expert Joseph Cohen, contending that he didn't have any experience evaluating rental-car-return facilities and stating that "he makes his living as a professional witness" and "he ain't gonna have a good living unless he's, you know, giving his clients what they want to hear."[46]  Defense counsel emphasized that Jarvis billed only $2,000, despite the fact that, in the expert-witness business, "you could do a lot better than $2,000."[47]  He repeated Jarvis's $2,000 estimate three times during his closing argument.[48]  In rebuttal, plaintiff's counsel defended the substance of his experts' opinions and argued that Hertz's experts' long histories of working for rental-car companies demonstrated their bias, not their expertise.[49]

The jury deliberated for about seven hours before sending out a note that read "Judge, what happens if we are not 100 percent on one side of the case?  How long do we have to deliberate?"[50]  I read the jury the Ninth Circuit's model instruction for a deadlocked jury, and

---

[44] *See id.* at 95:17–96:2; 113:21–114:12.

[45] *Id.* at 105:23–106:4–7.

[46] *Id.* at 106:8–17.

[47] *Id.* at 106:2–5.

[48] *Id.* at 106:2–5, 114:24–115:1.

[49] *See generally id.* at 134–137, 138:15–21 (arguing that Hertz's "so-called experts . . . can say what they like.  And, remember, these guys work for the car rental industry.  Do you think—if you're suing the car rental industry, do you think those guys are going . . . to give an opinion for somebody suing the car rental industry?  There's not a chance of that ever happening.  Not a chance.").

[50] ECF No. 283 at 3:9–11.

two hours later the jury returned a verdict finding in Hertz's favor.[51]  Neither party asked for the jury to be polled.[52]

## C.  Hertz's post-verdict attorneys' fees motion and bill of costs prompts De Freitas to move the court to set aside the judgment.

Having prevailed at trial, Hertz filed a motion for attorneys' fees under Nevada Revised Statute 17.117 and Nevada Rule of Civil Procedure 68, claiming that Hertz presented De Frietas with an almost $4 million offer of judgment, and De Freitas rejected it, ultimately recovering nothing at trial.[53]  Because that state statute allows for the recovery of expert-witness costs, Hertz included bills showing how much Hertz had paid its experts.  As it turns out, Hertz's design expert Jeffrey Jarvis's $2,000 fee guess was way off.  Hertz's accounting showed that Jarvis and TranSystems, the company Jarvis worked for, billed closer to $35,000 for his expert work.[54]  And Hertz seeks around $64,000 for Jeffrey Marcus's expert services,[55] though Marcus estimated at trial that he had billed closer to $25,000.

De Freitas now moves to set aside judgment[56] under Federal Rule of Civil Procedure 60(b)(3) and (b)(6), arguing that the disparity between Hertz's experts' testimony about their

---

[51] *Id.* at 9:22–10:14.

[52] *Id.* at 10:15–17.

[53] ECF No. 269 at 3.

[54] *See* ECF No. 268 at 5 (bill of costs); ECF No. 288 at 5 (noting a calculation error in the original bill of costs and explaining that Jarvis and TranSystems billed $34,926.72, not the $43,614.22 figure reflected in the bill of costs).

[55] ECF No. 268 at 5.

[56] In the body of his argument, De Freitas also contends that the misconduct he alleges warrants sanctions, "revocation of the *pro hac vice* status" of Hertz's lead counsel, "the payment of all costs and fees incurred and wasted" by De Freitas, and an order prohibiting Hertz's experts "from any further testimony in this proceeding."  ECF No. 287 at 4.  De Freitas doesn't mention those requests again and doesn't identify any legal authority showing the court's power to provide the varied and unorthodox relief he seeks.  So I consider this motion as seeking only the

compensation and the bills Hertz produced show that the experts perjured themselves on the stand.[57]  He also contends that Hertz's trial counsel must have known that the experts didn't accurately estimate their billing rates but in his closing argument he still chose to "compound [the experts'] evidentiary misconduct" by implying that De Freitas's experts were "hired guns" for plaintiffs' attorneys while emphasizing that Jarvis was paid just $2,000.[58]

## Analysis

**A.    De Freitas has not shown that Hertz's misrepresentations about its experts' fees warrant setting aside judgment.[59]**

FRCP 60 allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding" for a variety of reasons.[60]  Rule 60(b)(3) permits a court to vacate a judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."[61]  To prevail under subsection three, "the moving party must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party

---

relief sought in its title and conclusion block—the vacatur of the jury's verdict—and nothing more.  I also note that De Freitas did not file a motion for a new trial within the strict 28-day deadline for that rule, but this failure ultimately does not factor into the denial of relief.

[57] ECF No. 287.

[58] *Id.* at 1.

[59] De Freitas requests oral argument and an evidentiary hearing on this motion.  ECF No. 287 at 1.  After reviewing the record and the parties' briefs, I find this matter appropriate for disposition without oral argument as allowed by this district's local rule 78-1.  And I deny De Freitas's request for an evidentiary hearing because the record is sufficiently developed to rule on this motion without one.

[60] Fed. R. Civ. P. 60(b).

[61] *Id.* at (b)(3).

from fully and fairly presenting the defense."[62]  Rule 60(b)(3) "is aimed at judgments [that] were unfairly obtained, not at those which are factually incorrect,"[63] and it "requires that fraud not be discoverable by due diligence before or during the proceedings."[64]  Sanctionable conduct under FRCP 60(b)(3) need not be intentional; negligent misrepresentation can also support setting aside a judgment under the rule.[65]

A motion to set aside judgment may also be founded upon Rule 60(b)(6), which "vests power in courts adequate to vacate judgments whenever such action is appropriate to accomplish justice."[66]  The Ninth Circuit directs courts to apply this provision "sparingly,"[67] noting that relief is warranted only if "extraordinary circumstances" "prevented or rendered [the movant] unable to prosecute [his case]."[68]

De Freitas also appeals to the court's inherent authority to set aside judgment if it concludes that the prevailing party committed "fraud on the court."[69]  That power stems from "a rule of equity to the effect that under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments regardless of the term of their entry."[70]  The Ninth

---

[62] *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1260 (9th Cir. 2004) (quoting *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 880 (9th Cir. 2000).

[63] *De Saracho*, 206 F.3d at 880.

[64] *Casey*, 362 F.3d at 1260 (cleaned up).

[65] *In re M/V Peacock on Complaint of Edwards*, 809 F.2d 1403, 1405 (9th Cir. 1987).

[66] *Klapprott v. United States*, 335 U.S. 601, 614–15 (1949).

[67] *Foley v. Biter*, 793 F.3d 998, 1002 (9th Cir. 2015).

[68] *Martell v. Marine Cooks & Stewards Union*, 448 F.2d 729, 730 (9th Cir. 1971); *see also Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993).

[69] ECF No. 287 at 7.

[70] *United States v. Sierra Pac. Indus.*, 862 F.3d 1157, 1167 (9th Cir. 2017) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)).

Circuit has emphasized that "not all fraud is fraud on the court,"[71] and "the relevant inquiry is not whether fraudulent conduct prejudiced the opposing party but whether it harmed the integrity of the judicial process."[72]  Only "intentional, material misrepresentations that could not have been discovered earlier, even through due diligence," can support a fraud-on-the-court sanction.[73]

### 1.   *The parties hold competing views about whether Hertz's experts misrepresented their payments.*

De Freitas characterizes Jarvis's and Marcus's compensation testimony as fraud and defense counsel's closing-argument emphasis on Jarvis's low billing as fraud on the court.[74]  He insists that, in a case that revolved around the testimony and credibility of experts, these statements "prejudiced [De Freitas] and corrupted the jury's impression of the facts in this case to the extent that [De Freitas was] unable to prosecute [his] case before an impartial fact finder."[75]

Hertz responds that De Freitas's accusations are simply not borne out by the facts.  Jarvis submits a declaration explaining that he was an employee of TranSystems when he authored his

---

[71] *Id.* (quoting *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999)).

[72] *Id.* at 1168 (cleaned up).

[73] *Id.* at 1169.

[74] Hertz implies that I can't consider this motion because De Freitas appealed the judgment and vested jurisdiction solely with the Ninth Circuit.  ECF No. 288 at 1–2.  But FRCP 62.1 solves for this exact situation.  It allows courts to consider motions filed while an appeal is pending and either "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Civ. P. 62.1(a).  De Freitas is aware of this hurdle and also requests an indicative ruling under Rule 62.1.  ECF No. 286.  So I may consider the motion under that rule, and because I deny it, I also deny as moot De Freitas's motion for an indicative ruling.

[75] ECF No. 287 at 11.

reports in this case and was retained as Hertz's expert through that company.[76]  He was normally paid about $125 per hour for his work at TranSystems and was paid that amount to provide his opinions in this case, while TranSystems "kept the remainder of the expert-witness fee."[77]  When Jarvis was asked at trial how much he had been paid, he "thought about the inspection trip [that] [he] made to Las Vegas, [his] time reading expert reports and depositions, and the time it took [him] to prepare expert reports, and [he] estimated that those efforts equaled approximately 20 hours."[78]  Jarvis did some quick math ("20 hours of expert work at $125 an hour would equal $2,500 total"), and at trial he "guessed . . . that [he] had been paid either $2,000 or $2,500 based on the foregoing consideration and on-the-spot estimate."[79]  But Hertz also submitted invoices from TranSystems, signed by Jarvis, showing that he worked approximately 40 hours on this case in 2019 and that TranSystems billed Jarvis's time out at $450 an hour.[80]  So at the time of trial, Hertz had paid TranSystems about $26,000 for Jarvis's services.[81]

Hertz presents evidence that Marcus had been paid $24,900 before trial, which is $100 lower than what he testified to billing.  Months after trial ended, Marcus was paid an additional $39,114.31, "mostly related to costs and expenses incurred preparing for and attending" trial "and a *Daubert* hearing [that] required him to travel and stay in Las Vegas" before trial.[82] Marcus states in a declaration that Hertz's counsel didn't prepare him to discuss expert fees

---

[76] ECF No. 288-1 at 19–21.

[77] *Id.* at 20 ¶¶ 5–6.

[78] *Id.* at ¶ 8.

[79] *Id.* at ¶¶ 9–10.

[80] *See generally* ECF No. 288-4 (Jarvis's billing records).

[81] *See id.*; ECF No. 288 at 6.

[82] ECF No. 288 at 4; ECF No. 289-1 (spreadsheet of Hertz's expert payments).

before trial, he didn't know at the time of trial how much he had been paid to act as an expert, and he thus answered plaintiff's counsel's question based on his belief of what he had been paid up to that point.[83]

Hertz further notes that De Freitas's counsel did not ask either witness at their depositions how much they were paid, he did not subpoena their billing records, and he did not notice payment as a topic to be discussed at trial; instead he chose to broach the payment topic for the very first time during cross-examination at trial.[84]  Hertz's lawyers submitted declarations averring that they did not prep the question of payment with these experts, didn't have their billing records on hand during trial, and didn't remember those payments because most of them were made at least three years before trial began.[85]

### 2.  *De Freitas grossly overstates the misconduct he alleges.*

The majority of De Frietas's briefing is based on conjecture and wild assumptions: he asserts that Hertz, its counsel, and its witnesses plotted a grand conspiracy to lie about the billing rates for two of their many experts; that defense counsel is obviously lying about not knowing how much its experts were paid for a case in which discovery closed three years before trial; and that the witnesses knew they were committing perjury.  But De Freitas massively overstates the misconduct he complains of because a review of the record and Hertz's documentation of its experts' fees paints a picture that is far less intentional or impactive than the nefarious one De Freitas conjures.

---

[83] ECF No. 288-1 at 15–16.

[84] *See* ECF No. 288 at 2, 17.

[85] ECF No. 288-1 at 2–14, 17–18 (declarations of Hertz counsel Daniel J. Santaniello, Shayne Wulteern, Kevin Lazar, and Carlos Blumberg).

To begin with, only one of these experts was wrong about his compensation.  Marcus's testimony that his bill was "something like" $25,000 was nearly spot on.  Before testifying at trial, he had billed $24,900.  When asked at trial, "and how much <u>have you been paid</u> to give the opinions that you've given today?" Marcus answered "I believe I billed out in the last three and a half years $25,000.  Something like that."[86]  De Freitas hasn't demonstrated how that statement was false.  Instead he offers largely semantic arguments, claiming that Marcus said he "billed" $25,000, when he was "paid" $25,000 before trial but had "billed" more in the month leading up to the trial.[87]  But Capp's question specifically asked how much Marcus had been "paid," and Marcus's $25,000 answer was accurate.

Jarvis, on the other hand, did grossly underestimate how much Hertz had paid for his work by the time of trial.  While he was "guessing" that his invoices were "something like" $2,000 or "maybe" $2,500, he was wrong by a factor of about ten.[88]  But Capp's characterization of this bad guess as a "horrendous" error,[89] "perjury,"[90] and "conceal[ment] of the amounts"[91] Jarvis was paid is just not supportable by the record or reason.  The patently hedging nature of Jarvis's testimony made it clear that those numbers were not reliable and that Jarvis knew it.

It is also true that despite Jarvis's clear equivocation, Hertz's counsel capitalized on Jarvis's compensation estimate during his closing argument.  But as he and the rest of Hertz's counsel aver, he was unaware that Jarvis's billing amount was a misrepresentation at the time.

---

[86] *Id.* at 60:11–12.

[87] *See* ECF No. 290 at 5.

[88] ECF No. 247 at 79:1–12.

[89] ECF No. 287 at 10, n.2.

[90] *Id.*

[91] *Id.* at 12.

Defense counsel did not prepare the witnesses for billing questions and did not remember how much Jarvis or Marcus billed when they did the bulk of their work on the case three years earlier. There is simply nothing in the record from which this court could reasonably conclude that defense counsel heard Jarvis's guess, knew it was a lie, and chose to capitalize on it rather than correct it. But I find that defense counsel's excuse that they simply didn't know the answer to a question that almost all expert witnesses are asked is not very convincing. Defense counsel should be prepared for trial at least to the extent that they might catch obvious misrepresentations like the one Jarvis made. So I discount De Freitas's claims that defense counsel engaged in some intentional conspiracy to mislead the court and the jury, but I consider whether the misrepresentation unintentionally prevented De Freitas from fully and fairly presenting his case all the same.

### 3. Plaintiff's counsel could have caught Jarvis in his misrepresentation had he been diligent in discovery, and he has not shown that he was prevented from fully and fairly presenting De Freitas's case.

To prevail on a Rule 60(b)(3) or fraud-on-the-court challenge, the movant must show that the fraud he complains of could not have been discovered through due diligence before or during the proceedings.[92] Attorney Capp didn't depose Jarvis or Marcus about their billing rates, didn't subpoena any billing records, and didn't follow up with either witness to determine how they got to the numbers they provided. Capp appears to concede that he didn't do these things and instead argues that he was "entitled to reasonably rely upon the Hertz lawyers correcting any

---

[92] *Casey*, 362 F.3d at 1260; *Sierra Pac. Indus.*, 862 F.3d at 1169. De Freitas incorrectly argues that due diligence isn't a factor in the fraud-on-the-court inquiry. ECF No. 290 at 7. In *Sierra Pacific Industries*, the Ninth Circuit clarified that fraud does not disrupt the judicial process if it could have been discovered through due diligence, "despite some earlier language [in other cases] suggesting otherwise." *Sierra Pac. Indus.*, 862 F.3d at 1169.

untruths told to the court."[93]  But as discussed supra, De Freitas hasn't shown that defense counsel knew Jarvis's testimony was untruthful at the time and that the amount Jarvis quoted didn't jump out as surprising to them.  And had Capp performed any due diligence on this topic, he would have been armed with records and prior statements to impeach Jarvis when he offered an inaccurately low estimate.  Instead, he broke the cardinal rule of cross examination by asking questions at trial that he didn't know the answer to, and he now seeks to blame someone else for the way that strategy played out.

Nor has De Freitas shown that the misstatements about Jarvis's pay prevented him from fully and fairly presenting his case.  De Freitas put on four days of evidence, much of which was focused on the lane-width dispute.  His experts testified to the standards they believed were in place and how an errant driver would respond to 15-foot-wide lanes.  He emphasized those expert opinions during closing arguments and downplayed Hertz's contrasting expert opinions.  One misstatement about one expert's pay could not so undermine the presentation of De Freitas's evidence or mislead the jury such that it warrants setting aside the jury's defense verdict.

De Freitas claims that this expert-pay issue is more important than it seems because Hertz attacked De Freitas's experts as being "hired guns" and thus brought the credibility of the experts to center stage.  Defense counsel's comments primarily revolved around the experts' lack of expertise in the rental-car industry and their habit of working for lawyers, not the amount of pay they received to do their work.  But even accepting that the credibility of the competing experts was key, De Freitas was not prevented from correcting Hertz's impressions or portraying Hertz's experts as biased for their ties to the rental-car industry.

---

[93] ECF No. 290 at 8.

Having combed the trial transcript in light of Jarvis's misstatement, I cannot conclude that De Freitas was prevented from fairly presenting his case. The Fifth Circuit case that De Freitas cites for the proposition that expert-compensation lies are a big enough deal to set aside a judgment is too factually distinguishable. In *In re DePuy Orthopaedics, Incorporated, Pinnacle Hip Implant Product Liability Litigation*, plaintiffs offered two witnesses that counsel characterized as providing their testimony *pro bono*, despite the fact that one expected to be paid for his testimony, counsel had donated $10,000 to a charity of the other witness's choosing, and plaintiffs paid each witness $30,000 dollars after the trial concluded.[94]  The court found that plaintiffs' "repeated insistence that [the witnesses] had absolutely no pecuniary interest in testifying" while fully aware of the donation and one of the witnesses' expectation of payment provided clear and convincing evidence of misrepresentations under Rule 60(b)(3).[95]  It reasoned that counsel's misrepresentations prevented the defendants from fully and fairly defending themselves because the witnesses' testimony was crucial to the central dispute at trial and plaintiffs' counsel "repeatedly leveraged the false contrast between defendants' paid mercenaries and plaintiffs' unpaid altruists to his clients' advantage."[96]

While the instant case bears factual similarity to *In re DePuy Orthopaedics* in kind, it differs materially in magnitude. No one thought that Jarvis was providing testimony for free, and defense counsel did not overemphasize Jarvis's low rate at the expense of not pointing out the myriad other flaws in De Freitas's case. In short, the misconduct complained of here does

---

[94] *In re DePuy Orthopaedics, Incorporated, Pinnacle Hip Implant Product Liability Litigation*, 888 F.3d 753, 788–791 (5th Cir. 2018).

[95] *Id.* at 790–791.

[96] *Id.* at 792.

1  not reach the scope and brazenness of that in *In re DePuy Orthopaedics* such that Rule 60(b)(3)

2  relief is similarly merited.[97]

3

4  ### 4.   De Freitas has not shown that relief is warranted under the fraud-on-the-court doctrine.

5  De Freitas also has not shown that Jarvis's misstatements or defense counsel's references

6  to them amount to actionable fraud on the court.  The record does not establish that Jarvis's

7  compensation misrepresentation was intentional.  Hertz provides declarations from its lawyers

8  stating that they did not know at trial exactly how much the witnesses were paid and they didn't

9  prepare their witnesses for those questions.  Jarvis himself declares that he guessed or estimated

10  how much he thought he had been paid when asked but he didn't know the exact numbers, and

11  his equivocation at trial that he was "guessing" his invoices were "something like $2,000" or

12  "[m]aybe" $2,500 bolsters the notion that Jarvis wasn't confident in those numbers at all.  De

13  Freitas has presented nothing to show that these misrepresentations were intentional except for

14  bald accusations.  And while he's correct that the opinions and credibility of both parties' experts

15  were important factors in this case, Jarvis's waffly "guess" that he "maybe" had been paid

16  $2,500 was of little evidentiary value to either side.  At most, Jarvis's obvious hedging shows

17  that he forgot or had never calculated how much he was paid for work that he completed three

18

19  ---

[97] De Freitas also relies on *Hilliard v. Twin Falls County Sheriff's Office*, 2022 WL 4235126 (D. Id. Sept. 14, 2022), an unpublished magistrate-judge decision from the District of Idaho.  In that case, the magistrate judge ordered a new trial after a critical witness testified to receiving only $40 to testify as a non-retained expert, when in reality she had been paid closer to $90 and had been promised additional payment from plaintiff's counsel after trial.  Relying largely on the fact that plaintiff's counsel knew the witness's testimony was false but repeated it during closing argument, the magistrate judge ordered a new trial.  *Id.* at *4–6.  But Jarvis's testimony was not as critical as that of *Hilliard*'s witness, and I am not convinced that defense counsel's conduct during De Freitas's trial rises to the level of plaintiff's counsel in *Hilliard*.  So I am unpersuaded by this non-binding opinion.

years earlier and that defense counsel was not properly prepared for this line of questioning at trial either.

Nor was the misstatement about Jarvis's compensation material.  The Ninth Circuit has emphasized that fraud on the court encompasses only misrepresentations involving "the central issue in the case," in which "litigants intentionally misrepresented facts that were critical to the outcome of the case."[98]  For example, in *Pumphrey v. K.W. Thompson Tool Co.*, a Ninth Circuit panel reviewed the district court's decision to set aside judgment in a wrongful-death case caused by a misfired gun.  The plaintiff was "killed when he dropped a . . . handgun [manufactured by the defendants] and it fired, sending a bullet through his heart."[99]  The plaintiff sued the manufacturer arguing that the gun's safety was defective, and at trial the defendant introduced a video of drop-tests in which the gun was dropped from various heights and during those tests "the safeties performed as designed, and the gun never fired."[100]  In an unrelated lawsuit, it was discovered that the gun manufacturer actually made two drop-test videos, but one of them showed that the gun fired when dropped.  That second video was never produced in *Pumphrey*, and the manufacturer's expert witness "testified several times [in that case] that he had conducted drop-tests of the [gun] but it had never fired."[101]  Because the central issue in *Pumphrey* was whether the gun "could fire when dropped with one or both safeties engaged," and the undisclosed video showed that it could, burying that video was material to the trial's outcome.[102]

---

[98] *United States v. Estate of Stonehill*, 660 F.3d 415, 452 (9th Cir. 2011).

[99] *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995).

[100] *Id.*

[101] *Id.*

[102] *Id.* at 1133.

I cannot conclude that how much Jarvis was paid—and his low-ball guess at it—was critical to the outcome of this case.  The central focus of Hertz's closing arguments was the quality of the competing experts' credentials and the relevance of their experience, not their cost. Hertz's attorney validly attacked De Freitas's experts' lack of experience in the rental-car industry—a fact that each witness readily admitted at trial.  He also denigrated De Freitas's experts for being professional witnesses who market their services to attorneys—again, after those experts conceded the truth of that characterization.  While defense counsel brought up Jarvis's fee and the fact that Jarvis was a first-time expert, he didn't emphasize how much plaintiffs' experts had been paid in contrast.  He also focused on the theory that Stevens alone was responsible for the crash and asked the jury to conclude that Stevens's pedal confusion was to blame, not Hertz's lane design.  So on the whole, I cannot conclude that Jarvis's guess that he'd been paid less than a tenth of his actual fee was so material that it undermines confidence in the verdict or in the judicial process.  So I deny De Freitas's motion for relief under the fraud-on-the-court doctrine.

### 5. *De Freitas's allegations of additional misconduct do not warrant setting aside the judgment.*

De Freitas offers a list of additional grievances against Hertz's counsel that he contends warrant setting aside the judgment.[103]  First among them is his contention that Hertz's lawyer

---

[103] Hertz argues that De Freitas needed to raise attorney-misconduct arguments in a timely motion for a new trial and, because he didn't, he waived those arguments.  ECF No. 288 at 8–9. Hertz doesn't cite any authority for this proposition and fails to explain why additional misconduct can't be considered under Rule 60(b) or the fraud-on-the-court doctrine.  So I do not consider that argument.  But I do note that, generally, attorney-misconduct arguments are indeed raised in motions for a new trial, and the Ninth Circuit has developed particular standards governing whether attorney misconduct at trial warrants drastic relief.  To the extent that De Freitas is invoking that law, his arguments still fail.  Attorney misconduct may justify a new trial only when the "flavor of misconduct sufficiently permeates an entire proceeding to provide

deliberately disobeyed a court order by mentioning in his closing argument a phone call that I had previously ruled could not be discussed.[104]  De Freitas's counsel objected to that mention at trial, the parties engaged in an extended sidebar discussion about the issue, and I instructed the jury to "disregard counsel's statements that the calls never happened."[105]  Any prejudice to De Freitas based on that comment was alleviated by my contemporaneous curative instruction, and De Freitas has not otherwise shown that defense counsel's comment about the calls prevented him from presenting his case.

De Freitas also complains that defense counsel during closing argument attributed an opinion to plaintiff's expert Joseph Cohen that Cohen only discussed in his deposition and never testified about at trial.[106]  Capp objected vigorously in front of the jury and at sidebar, I reminded the jury that their recollection of testimony controlled, and Capp took the opportunity in his rebuttal closing argument to set the record of Cohen's opinion straight.[107]  De Freitas has not

---

conviction that the jury was influenced by passion and prejudice in reaching its verdict." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 516–17 (9th Cir. 2004) (cleaned up) (quoting *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1984)).  De Freitas has not shown that any of defense counsel's statements so prejudiced the jury that setting aside judgment is the only just response.

[104] *See* ECF No. 287 at 19–20; ECF No. 282 at 17:5–18.

[105] ECF No. 282 at 98:1–101:24.

[106] *See Id.* at 107:2–109:24.

[107] De Freitas also complains about the opinions of Hertz's medical expert Dr. Pitchon, calling the opinions expressed at his deposition and in his expert report "obvious lies."  ECF No. 287 at 22.  But Dr. Pitchon didn't testify at trial, and the only reason that the jury heard his name and his opinions at all was because Capp kept improperly mentioning them when questioning other witnesses.  Dr. Pitchon's expert opinions—that the jury *didn't hear*—have nothing to do with alleged misconduct at trial, so I don't consider them.  I also don't consider Hertz's one-sentence request, buried 23 pages into its response, to order Capp to pay Dr. Pitchon's deposition fees that Hertz alleges that Capp agreed to pay.  ECF No. 288 at 23.  If Hertz desires such relief from the court, it must file a proper motion requesting that relief.  *See* L.R. IC 2-2(b) ("For each type of relief requested or purpose of that document, a separate document must be filed and a separate event must be selected for that document.").

1  shown that defense counsel's misattribution prejudiced his case or prevented him from

2  presenting it.  So the "additional misconduct" that De Freitas complains of—either

3  independently or collectively—does not warrant setting aside judgment under Rule 60(b)(3) or

4  the fraud-on-the-court doctrine.  And just as De Freitas's allegations do not compel me to set

5  aside judgment under subsection (b)(3), they do not persuade me that setting aside judgment

6  would "accomplish justice" under subsection (b)(6).

7
**B.   Hertz's motion for attorneys' fees is denied because Hertz has not established that**
8      **the offer of judgment was properly served.**

9         Rule 68 of the Nevada Rules of Civil Procedure and Nevada Revised Statute 17.117

10  authorize a litigant to make an offer of judgment to resolve a case.  If the defendant makes an

11  unconditional offer under these rules and the plaintiff rejects it and fails to beat it at trial, the

12  court can order the plaintiff to pay the defendant's post-offer costs and reasonable attorney's fees

13  "from the time of the offer."[108]  Because these Nevada state offer-of-judgment rules are

14  substantive and do not conflict with a federal law, they apply in this diversity case.[109]

15         De Freitas's primary argument against Hertz's entitlement to attorneys' fees under NRCP

16  68 is a technical but important one: Hertz didn't properly serve the offer of judgment.  "In cases

17  involving Rule 68 offers, service of process must comply with [FRCP] 5(b)."[110]  Actual notice of

18  an offer of judgment does not suffice.[111]  Federal Rule of Civil Procedure 5(b) provides the

19  service requirements for papers exchanged between parties.  As relevant here, Rule 5(b)(2)(E)

20

---

21  [108] Nev. R. Civ. P. 68(f)(2); Nev. Rev. Stat. § 17.117.

22  [109] *See MRO Commc'ns, Inc. v. Am. Tel. & Tel. Co*., 197 F.3d 1276, 1284 (9th Cir. 1999).

23  [110] *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1429 (9th Cir. 1996) (analyzing service of
   offers of judgment under Federal Rule of Civil Procedure 68).

   [111] *Id.* at 1431.

permits service by "sending it to a registered user by filing it with the court's electronic-filing system or sending it by other electronic means that the person consented to in writing."  Rule 5(b)(2)(F) further allows service by "delivering it by any other means that the person consented to in writing."  The Ninth Circuit has permitted parties to overcome technically defective service if they can show "exceptional good cause" for failing to comply with Rule 5(b).[112]  The circuit adopted that standard from the Middle District of North Carolina in *Salley v. Board of Governors*,[113] in which the district court concluded that evidence showing that the receiving party "had explicitly consented to service of discovery requests by fax on several previous occasions" demonstrated exceptional good cause.[114]

### 1.   *Hertz cannot show that De Freitas consented in writing to email service.*

Twenty-one days before trial, Hertz emailed to Capp an offer of judgment.[115]  De Freitas strenuously argues that neither he nor his attorney consented to service by email.[116]  Hertz's attorneys counter via declaration that everyone stipulated to service by email early on in this case, but they cannot remember if the stipulation was verbal or written and cannot produce a written agreement about email service.[117]  This precise situation is why the Federal Rules of Civil Procedure demand *consent in writing*.

Acknowledging that it doesn't have proof of Capp's consent to email service in writing, Hertz produces some emails that reflect that certain discovery and deposition documents were

---

[112] *Id.* at 1431.

[113] *Salley v. Bd. of Governors, Univ. of N.C.*, 136 F.R.D. 417, 419 (M.D.N.C. 1991).

[114] *Magnuson*, 85 F.3d at 1431 (citing *Salley*, 136 F.R.D. at 420).

[115] ECF No. 269-4; ECF No. 273-3.

[116] *See generally* ECF No. 272; ECF No. 277; ECF No. 280.

[117] *See* ECF No. 275-1.

sent by email, but Hertz does not attach the documents themselves or any certificates of service showing that those documents were served only by email.[118]  And Capp responds that "[t]hroughout the entire litigation every document and notice was scrupulously served by the U.S. mail" and that "only courtesy copies" were sent via email.[119]  He attaches several documents with certificates of service demonstrating that documents were served either via the court's electronic filing system or by mail.[120]  Capp also produces emails in which he told Hertz's counsel that he did not receive some mailed discovery documents and asked for an extension to respond to them.[121]  He claims that such an exchange wouldn't have happened if it had been the parties' practice to simply email discovery.[122]  On this record, I cannot conclude that Hertz has shown exceptional good cause to permit service via email in this instance.

### 2.   *Consenting to the court's electronic-filing system doesn't constitute consent to email service of documents not filed on the docket.*

Hertz also appeals to this district's local rules to argue that De Freitas's use of the court's electronic-filing system equates to consent to service by email.  Local Rule IC 4-1 states that "[p]articipation in the court's electronic filing system by registration and receipt of a login and password constitutes consent to the electronic service of pleadings and other papers under

---

[118] *See* ECF No. 275-2.

[119] ECF No. 272 at 5; ECF No. 272-2.

[120] *See* ECF No. 272-3; ECF No. 272-4; ECF No. 272-5; ECF No. 277-2; ECF No. 277-3.  I grant De Freitas's motion to file a surreply (ECF No. 277) to the extent that I consider the declarations and exhibits attached to it and those attached to Hertz's response to the surreply motion.  I find the argument it contains unnecessary to the resolution of the attorneys' fees motion because it mostly regurgitates arguments contained in De Freitas's response.

[121] ECF No. 272-2 at ¶ 8; ECF No. 272-6.

[122] ECF No. 272-2 at ¶ 8.

applicable rules, statutes, or court orders."[123]  Hertz reads this rule to mean that using the court's

filing system means an attorney consents to service of all litigation-related documents by *any*

electronic means—like email.  Hertz doesn't point to any District of Nevada judge who has

interpreted the rule to reach that broadly.[124]  And to the extent that it could be interpreted in the

manner that Hertz suggests, the local rule would conflict with FRCP 5, which requires consent *in*

*writing* to permit alternative forms of service.  Reading LR IC 4-1 to automate consent to *all*

electronic means of service when an attorney uses the court's docketing system—a system that

attorneys are *required* to use[125]—would render FRCP 5(b)(E) meaningless and lead to absurd

results.  Under Hertz's interpretation, an attorney could serve documents via text, Facebook, or

WhatsApp (or any other "electronic means" of transmitting information) without consent, merely

because an attorney used the required filing system.  So I reject Hertz's argument that Capp's use

of the electronic-filing system alone constitutes automatic consent to service by email for unfiled

documents exchanged in a case.

The offer of judgment that Hertz relies on was not properly served, and Hertz does not

point to any authority allowing me to overlook that deficiency.  So I do not rely on the offer of

judgment or NRS 17.117 to award Hertz's requested attorneys' fees.  Because Hertz does not

rely on any other statutory or contractual basis to award fees in this case, I deny its motion.  I

---

[123] L.R. IC 4-1(a).

[124] The only case Hertz cites in support of its argument that consent to the court's electronic-filing system constitutes consent to email service is an unpublished table decision from the Supreme Court of Nevada, *Gibson v. Second Jud. Dist. Ct. in and for Cnty. of Washoe*, 406 P.3d 962 (Nev. 2017).  That case interpreted Nevada's service rules and Nevada's electronic-filing rules.  Those don't apply here—in federal court, federal procedural rules apply.  *See In re Cnty. of Orange*, 784 F.3d 520, 529 (9th Cir. 2015).  And I am not persuaded that federal courts would follow Nevada's interpretation in this case for the reasons explained *infra*.

[125] *See* L.R. IC 2-1(a) ("attorneys . . . must register" with the court's docketing system and "must file all documents electronically as set forth in these rules").

also deny Hertz's bill of costs because it requests reimbursement for costs available under NRS 17.117 and NRS 68.  Since Hertz cannot rely on those statutes for attorneys' fees, it cannot also not rely on them for costs.  Hertz's bill of costs also contains several cost categories that are not itemized and mixes taxable and non-taxable costs in its request.   So I deny the bill of costs without prejudice to Hertz's ability to refile a version that omits the state-law costs and properly adheres to this court's local rules.  Hertz is advised to carefully review this district's local rules 54-1 through 54-11 before resubmitting its request.

### Conclusion

IT IS THEREFORE ORDERED that Carlos Alberto Rodrigues De Freitas's motion to set aside judgment **[ECF No. 287] is DENIED.**

IT IS FURTHER ORDERED that De Freitas's motion and request for limited remand **[ECF No. 286] is DENIED.**

IT IS FURTHER ORDERED that Hertz's motion for attorneys' fees **[ECF No. 269] is DENIED.**

IT IS FURTHER ORDERED that Hertz's bill of costs **[ECF No. 268] is DENIED without prejudice to refiling a corrected version consistent with this order by March 25, 2024.**

IT IS FURTHER ORDERED that De Freitas's motion to file a surreply **[ECF No. 277] is GRANTED in part.**  The Court considered the exhibits attached to De Freitas's proposed surreply and Hertz's response to the surreply motion but did not consider the arguments contained in the briefs themselves as they were largely duplicative of arguments already raised.

_____
U.S. District Judge Jennifer A. Dorsey
March 13, 2024

28